IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:06CV212-H

| | |
|---|---|
| BARBARA S. EUSTLER, )<br>      Plaintiff, )<br>)<br>      vs. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social )<br>Security Administration, )<br>      Defendant. )<br>) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #12) and "Brief Supporting ..." (document #13), both filed January 26, 2007; and Defendant's "Motion For Summary Judgment" (document #16) and "Memorandum in Support of the Commissioner's Decision" (document #17), both filed April 25, 2007. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

## I. PROCEDURAL HISTORY

On January 14, 2002, the Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging she was unable to work as of September 9, 1997, due to "trouble concentrating ...

trouble remembering, short [sic] of breath, headaches, neck and back pain and flashbacks." (Tr. 90.) The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on July 6, 2005, and at which the Plaintiff was represented by a non-attorney. On August 23, 2004, the ALJ issued a decision concluding that the Plaintiff was not disabled. The Plaintiff filed a timely Request for Review of Hearing Decision. On April 7, 2006, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on May 11, 2006, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Relevant to the issues raised on appeal, the Plaintiff testified that she was 30 years-old at the time of the hearing; that she had completed the eighth grade; that she lacked only two classes to complete her GED, which was a struggle due to "concentration problems"; that she lived with her boyfriend, who performed all of the household chores; that she suffered chronic pain, panic attacks, depression, and frequent mood swings; that she could not concentrate and did not like to be around people; that she was unable to "motivate" herself to perform household chores; that she spent her time watching television and doing schoolwork; that she could sit for only fifteen minutes and could not lift more than 10 pounds; that she could not keep a schedule, causing her to miss many doctor's appointments; that she had worked as a waitress in 2000; that she had other work experience as a babysitter and cashier; that she suffered "flashbacks" to a prior gunshot wound and earlier sexual abuse; that her boyfriend had to remind her to bathe; that she could not sleep well; and that she had not abused alcohol or drugs since February 2002.

A Vocational Expert ("VE") classified the Plaintiff's prior work experience as light and semi-skilled (waitress) and light and unskilled (cashier).

The ALJ then gave the VE the following hypothetical:

> assume .. that the [Plaintiff's] exertional impairment would permit sedentary and light work on a sustained basis. But assume significant non-exertional impairments, particularly emotional ... limit [Plaintiff] to jobs of a simple, routine, repetitive nature ... low stress jobs of a non-production nature ... allow ... [no] more than limited interaction with either large numbers of co-workers or large numbers of people, dealing more one-on-one or working with things rather than the general public. Also assume a degree of significant pain ... rule out sustained skilled concentration .... If we were to place those non-exertional restrictions on a female of 29 to 30 years of age with the limited but literate educational level ... and the prior work to the extent it might be relevant, are there jobs such a person could do?

(Tr. 713-14.)

The VE testified that with these limitations, the Plaintiff could work as a poly-packer heat sealer (2,800 light and unskilled jobs available in North Carolina), and as a wire wrapping machine operator (6,900 light, unskilled jobs available in North Carolina).

On June 17, 2002, Joseph Dykes, M.D., an Agency medical expert, completed a Physical Residual Functional Capacity Assessment, noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; that her ability to push and/or pull was unlimited; that the Plaintiff should never attempt to climb or balance, had limited ability to reach overhead, and should avoid exposure to hazards; and that otherwise, the Plaintiff had a residual functional capacity ("RFC") for medium work. In reaching this conclusion, Dr. Dykes noted that the Plaintiff's medical records showed that she walked normally, had normal range of motion and muscle strength, could perform dextrous movements with both hands, and had no swelling or enlargement of her joints.

On August 9, 2002, Arlene M. Cooke, Ph. D., an Agency psychological expert, completed

a Psychiatric Review Technique, and noted that Plaintiff suffered depression, anxiety (post-traumatic stress disorder), and a borderline personality disorder, and had a history of drug and alcohol abuse, but that those disorders had no more than a "moderate," that is, nondisabling, impact on her activities of daily living, social functioning, and abilities to concentrate or maintain persistence or pace in a work-like setting.

The same day, Dr. Cooke completed a Mental Residual Functional Capacity Assessment, concluding that Plaintiff had a moderate restriction on her ability to understand, remember and carry out detailed instructions; to concentrate for extended periods; to work within a schedule; to work with co-workers and the general public; to accept instructions and criticism; to respond to changes in the workplace; and to set realistic goals. Dr. Cooke also concluded that the Plaintiff was able to understand, remember and carry out simple directions; to concentrate and adapt to changes in work settings sufficiently to complete simple, routine, repetitive tasks; to maintain adequate relationships with others; and to perform simple, routine, repetitive tasks in a stable, low stress environment with limited demands for interpersonal interaction. In reaching these conclusions, Dr. Cooke further noted that a recent psychological evaluation showed that Plaintiff had no suicidal thoughts, had an appropriate affect, could think abstractly, and had an intact memory; and that Plaintiff had stated that she was able to study for her GED, visit with her sister, and work crossword puzzles.

On December 9, 2002, Steve Salmony, Ph. D., also an Agency psychological expert, reviewed and affirmed Dr. Cooke's evaluation and conclusions.

Except for the inclusion of an additional note from her records at CMC Randolph, discussed below, the Plaintiff has not assigned error to the ALJ's recitation of the medical records (presented to the ALJ at or after the hearing). Moreover, the undersigned has carefully reviewed the Plaintiff's

medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> The medical records show that the claimant has a history of a gunshot wound to the abdomen, substance abuse, and mood disorders. The claimant was admitted to Carolinas Medical Center on September 9, 1997 for a gunshot wound to the abdomen. She remained hospitalized until October 20, 1997. She was discharged in stable condition and advised to seek follow-up care at the Trauma Clinic (Exhibit B19F).
>
> Hospital notes from Stanly Memorial Hospital in May 2001 indicate that the claimant had fallen, hitting her lower back. She sought treatment after she began a fever and experienced right-sided back pain. She was diagnosed with acute pyelonephritis, major depression, tobacco abuse and a recent contusion of the lumbar spine. She was released that same day after being prescribed Lortab, Tylenol, Levoquin and Phenergan (Exhibit Bl IF).
>
> Continuing hospital reports show that the claimant was treated at the Carolinas Medical Center Emergency Room on October 17, 2001 after sustaining injuries in a motor vehicle accident. Hospital notes indicate that the claimant complained of diffuse tenderness over the mid and upper thoracic spine. She was discharged in stable condition and prescribed Lortab and Ibuprofen for pain. Radiology reports indicate that there was no acute bony abnormalities of the thoracic spine (Exhibit B 19F)'
>
> The claimant returned to Carolinas Medical Center Emergency Room in October 2001 and December 2001. In October she alleged chest pain and shortness of breath. She was prescribed an antibiotic medication for her congestion. In December, she returned with complaints of a right sided facial droop and problems walking due to numbness and tingling. It was determined that the claimant had Bell's Palsy and she was discharged and advised to seek further treatment at a family practice clinic (Exhibit B 19F).
>
> Treatment notes from Piedmont Behavioral Healthcare in 2000 and 2001 show that the claimant sought treatment for complaints of insomnia, irritability, poor appetite and lethargy in October 2000. She started therapy sessions and in November 2000. she reported "doing fairly well." A service note on November 21, 2000 indicated that the claimant had previously sought assistance for complaints of depression in November 1999 and failed to keep follow-up appointments. When she did return, almost a year later, she indicated that Celexa had improved her depressive symptoms. Supportive therapy was given to claimant in November 2000 and she was advised to restart antidepressant medication. It was noted that the claimant's depressive symptoms and anxiety were under poor control at that time and she was advised to

continued individual therapy. She agreed to attend sessions, however, she failed to attend the session in December 2000 nor in January 2001. In January 2002, the claimant was discharged from further treatment due to her unwillingness to commit to more consistent treatment. It was indicated that she would seek treatment during a crisis and then stop prescribed treatment when the immediate crisis was dealt with (Exhibit B8F).

In February 4, 2002, Piedmont Behavioral Healthcare received a voicemail from the claimant stating that had slit her wrists and was "very suicidal'". The proper authorities were notified of the threat and they were able to locate her. Once located, the claimant reported that she had attempted to cur her wrists, but that she was not bleeding and that her abusive boyfriend had "'set her off". On February 7, the claimant alleged that she was not suicidal and only cut her wrists so that her boyfriend would let her leave his apartment. It was also indicated in treatment notes that the claimant had legal problems and had been arrested for forging checks and tested positive for THC. The claimant admitted drinking alcohol during the prior week and abusing drugs on February 5, 2002 (Exhibit B8F).

On February 5, 2002, the claimant was admitted to Rowan Regional Medical Center after the claimant alleged cutting her wrists. She admitted that the last time she saw her psychiatrist was July 2001. She also admitted drinking and smoking marijuana two days earlier. The initial assessment was major depression with suicidal act. rule out bipolar disorder and marijuana abuse. She was discharged after three days in stable condition and advised to continue to seek assistance at the Piedmont Behavioral Healthcare center in Salisbury and to go to the Woman's Shelter. The claimant opted to go to a friend's place (Exhibit B 14F).

In April 2002, the claimant underwent a psychiatric evaluation at Piedmont Behavioral Healthcare. It was noted that the claimant has a history of sexual abuse since the age of three and had been depressed since early childhood. At the time of evaluation, the claimant alleged that she was not drinking and was attending a substance abuse group at the Clinic. It was concluded that the claimant had a post-traumatic stress disorder, a history of substance abuse, a borderline personality disorder, chronic back pain, migraine headaches and history of a gunshot wound. She was encouraged to continue engaging in supportive psychotherapy. When she returned in May 2002, the claimant indicated that her depression was improving. It was noted that Wellbutrin was controlling her depression and that Risperdal was helping her to sleep. Dr. Burjoss. the treating psychiatrist, concluded that the claimant "was responding very well to the antidepressant medication without side effects" (Exhibit B8F).

On June 5, 2002, the claimant underwent a consultative examination conducted by Dr. Tyler Freeman. The physician indicated that the claimant had normal muscle strength, no motor or sensory deficits and a good range of motion. He concluded that

the claimant had a history of depression, anxiety and a post traumatic stress disorder, headaches, back discomfort and shortness of breath secondary to heat. He described the claimant as having normal vital signs and a normal range of motion (Exhibit B 16F).

On June 26, 2002, the claimant underwent a consultative psychiatric evaluation conducted by Dr. Carol Gibbs. The psychiatrist noted that the claimant had a history of abusive relationships. numerous suicide attempts, a borderline personality disorder, and a history of low frustration tolerance. It was further concluded that the likelihood of significant recovery in the next twelve months was quite low given the chronicity of her symptoms. The claimant was described as "guarded'" during the interview and appeared to be of average intellectual functioning (Exhibit BI7F).

Treatment notes from CMC Randolph in 2002 show that the claimant sometimes reported feeling better and at other time complained of not being able to sleep. In November 2002, her anxiety and depression were described as decreasing. In December 2002, the claimant's motivation and energy was described as "better". In February 2003, the claimant alleged that her anti-depressant medications were not working and in March 2003, notes show that the claimant alleged increased anxiety and depressive symptoms. Continuing notes in 2003 reflect the claimant's subjective allegation of increasing depression and anxiety (Exhibit B20F). Little weight is given to diagnostic conclusion made by treating physicians at CMC Randolph since notes primarily reflect the claimant's subjective complaints.

On June 17, 2004, the claimant was examined at Carolina Neurosurgery & Spine for complaints of back and neck pain. She exhibited a normal gait and had no focal neurological deficits. X-ray films of the thoracic back confirmed a bullet fragment at the T-l 1 level. There was not change in the bullet fragment when the films were compared to earlier films from 1997. She was described as having a chronic pain syndrome and a headache disorder (Exhibit B 27F).

(Tr. 23-25.) As the Plaintiff points out in her brief, the ALJ did not expressly mention a November 17, 2003 note from one of her treating physicians at CMC Randolph, a Dr. Yeomans, who wrote a brief note stating that Plaintiff had a diagnosis of schizoaffective disorder, was maintained on medication with supportive therapy, and was "considered disabled." (Tr. 119.) As the Plaintiff concedes, however, and as quoted above, the ALJ clearly was considering Dr. Yeoman's opinion when he concluded that "little weight" was to be given to the conclusions "of the treating physicians at CMC Randolph."

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the

8

evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff's history of a gunshot wound to the abdomen, substance abuse, and mood disorders were severe impairments, but that her impairments or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff had moderate limitations on her activities of daily living, social functioning, and concentration; that the Plaintiff had experienced one or two episodes of decompensation in a work-like setting; that the Plaintiff was unable to perform her past relevant work; that the Plaintiff was a "younger individual" with a "limited" education; and that the Plaintiff retained the residual

---

[1] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

9

functional capacity to perform light,[2] unskilled work limited to "simple repetitive, routine tasks, in a stable low stress setting with limited demands for intensive interpersonal interaction." (Tr. 26-28.)

After noting correctly that Medical-Vocational Rule 202.18 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform.  The VE's testimony, stated above and based on hypotheticals that factored in the noted limitations, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and therefore, that she was not disabled.

The Plaintiff essentially appeals the ALJ's determination of her mental residual functional capacity ("RFC").  See  Plaintiff's "Motion for Summary Judgment" (document #12) and "Brief Supporting ..." (document #13).  Indeed, the Plaintiff has not mentioned, much less objected to, the ALJ's determination that she could perform the exertional requirements of light work. Moreover, there is substantial evidence supporting the ALJ's finding concerning the Plaintiff's residual functional capacity (both exertional and nonexertional), which Social Security Regulations define as "what [a claimant] can still do despite h[er] limitations."  20 C.F.R. § 404.1545(a).  The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a

---

[2]"Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether the Plaintiff's alleged impairments limited her ability to work. Relying on evidence in the medical record, Agency medical evaluators found that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; that her ability to push and/or pull was unlimited; that the Plaintiff had no nonexertional limitations other than avoiding climbing, balancing, hazards, or frequent overhead reaching; and that she otherwise had a residual functional capacity for medium work. Agency psychological evaluators found that the Plaintiff's mental and emotional impairments had, at most, a moderate, nondisabling impact on the Plaintiff's ability to work; and that she was able to perform simple, routine, repetitive tasks in a stable, low stress environment with limited demands for interpersonal interaction.

The ALJ found the Plaintiff not disabled, however, based on a residual functional capacity for <u>light</u> unskilled work limited to simple, routine, repetitive tasks in a stable low stress setting with limited demands for intensive interpersonal interaction. In other words, the ALJ concluded that the Plaintiff had a <u>lower</u> residual functional capacity than reviewing experts concluded was supported by the objective medical record. Moreover, the ALJ made a significant allowance for the Plaintiff's difficulty concentrating, interacting with other people, and her other mental and emotional impairments by limiting her to work that was unskilled, that was simple, repetitive and routine, and that was low stress, particularly in regard to interaction with others.

As noted above, although the Plaintiff assigns error to the ALJ's failure to expressly acknowledge Dr. Yeomans' November 17, 2003 note that due to her mental and emotional condition, the Plaintiff was "considered disabled," she concedes that this opinion was <u>not</u> entitled to

controlling weight and that the ALJ was clearly referring to this note, among others, when he concluded that "little weight" was to be given to the conclusions "of the treating physicians at CMC Randolph." See "Plaintiff's Brief Supporting ..." at 8 (document #13).[3]

Moreover, there is substantial evidence in the record to support the ALJ's essential conclusion that the Plaintiff suffered from, but was not disabled by, her mental and emotional impairments. Treatment notes from Piedmont Behavioral Healthcare ("Piedmont") show that the Plaintiff sought mental health treatment only when she had a crisis and then ignored the advice of her doctors and counselors by refusing to follow through on consistent treatment needed to help avoid crises. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965). Indeed, "a[n] unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility." Mickles, 29 F.3d at 930.

The Plaintiff first sought mental health treatment at Piedmont in 1999, but did not return for a year. When Plaintiff returned, she appeared moderately depressed, but was alert and oriented,

---

[3] Even if the Plaintiff had made such an assignment of error, the Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

friendly and cooperative, and had good judgment and insight. By 2001, Plaintiff's impairments were under fair to good control with treatment. The Plaintiff's treating psychiatrist consistently found that Plaintiff was only moderately or mildly depressed. (Tr. 233, 238, 242, and 244.) In July 2001, the Plaintiff told her counselor that she was babysitting a friend's son in exchange for receiving room and board. In a February 2002 mental status examination, the Plaintiff exhibited only a few slight impairments. Finally concerning the Plaintiff's visits to Piedmont, her treating counselors consistently assigned Global Assessment of Functioning ("GAF")[4] scores over fifty[5] indicating only moderate limitations. (Tr. 453, 455, 463, 468, 471, 473, 476, 478, 480, 486, 488, and 613.)

The records show that Plaintiff began receiving treatment at CMC Randolph in July 2002. At many visits, Plaintiff reported that she felt better and had improvement with medication (Tr. 454, 460, 470, 477, 480, 485, 487, 613, 617, 618, and 619.) In the last note of treatment at CMC Randolph, dated March 30, 2004, the Plaintiff's therapist opined that Plaintiff made good progress and should continue to do well if she complied with medication.

On June 26, 2002, Dr. Gibbs conducted a mental examination and documented that the Plaintiff successfully performed the concentration test, appropriately named large cities, and accurately performed calculations. While Dr. Gibbs suggested that Plaintiff might not make a significant recovery from her symptoms, she never indicated that Plaintiff would be unable to

---

[4] The GAF scale is used for reporting the clinician's judgment of the individual's overall level of functioning and concerns psychological, social and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994) (hereinafter, DSM-IV).

[5] A GAF of fifty-one to sixty indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

perform simple, repetitive work, and overall she determined that Plaintiff had a GAF of fifty-five which indicated only moderate limitations. *See* DSM-IV at 32.

The record also establishes that the Plaintiff engaged in significant daily life activities, such as bathing and dressing herself, pursuing her GED, watching television, visiting with her family, completing crossroad puzzles, and working as a babysitter and waitress. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory

findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of both the Plaintiff's physical and mental/emotional impairments which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible. Id.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, that is, Plaintiff's ability to take care of her personal needs, to work as a babysitter and waitress, and to pursue a GED, as well as the above noted objective evidence in the medical record.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v.

Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. Plaintiff's "Motion For Summary Judgment" (document #12) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #16) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: April 30, 2007

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge